**Kenneth CRAWFORD, et al., Plaintiffs,**

v.

**NATIONAL LEAD COMPANY, et al., Defendants.**

**No. C–1–85–0149.**

United States District Court, S.D. Ohio, W.D.

Feb. 13, 1989.

Stanley M. Chesley, Louise Roselle, Cincinnati, Ohio, for plaintiffs.

Jake J. Chavez, Russell M. Young, U.S. Dept. of Energy, Washington, D.C., Donetta D. Wiethe, Asst. U.S. Atty., Cincinnati, Ohio, for defendants.

## ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

SPIEGEL, District Judge.

This matter is before the Court after a hearing on plaintiffs' motion for partial summary judgment (doc. 108), defendants' response in opposition thereto (doc. 130), and plaintiffs' reply memorandum (doc. 131). The Court also heard argument on defendants' motion for summary judgment (doc. 115), plaintiffs' response (doc. 125), defendants' reply (doc. 143), and plaintiffs' surreply (doc. 145). Both motions are decided by this Order.

This case involves the operation of a federally-owned uranium metals production plant located near Fernald, Ohio. The Feed Materials Production Center (FMPC) provides the uranium in various forms to nuclear facilities throughout the country for use in the production of nuclear weapons and energy. Defendants herein are NLO, Inc. (NLO), the contractor that operated the FMPC for the government from 1951 through 1985, and NL Industries, Inc. (NLI), NLO's parent corporation. Plaintiffs are the neighbors of the FMPC.[1] They alleged that defendants failed to prevent the emission of uranium and other harmful materials from the FMPC and that such failure caused emotional distress and diminished property values. Plaintiffs proceed under six theories of liability—negligence, strict liability, nuisance, willful or wanton misconduct, breach of contract, and violation of the Price–Anderson Act (42 U.S.C. § 2210)—and seek damages and injunctive relief.

### I

The FMPC is a 1,050 acre facility owned by the United States Department of Energy (DOE). In 1951, NLO contracted with the Atomic Energy Commission (AEC), the predecessor agency of the DOE, to operate the plant. NLI was required to ratify the contract as guarantor of NLO's performance. This contractual arrangement between NLI, NLO and AEC/DOE empowered defendants to operate and maintain the FMPC, and required them to procure all necessary permits and to comply with all applicable regulations, laws and requirements relating to health and safety. The extent and nature of defendants' work under the contract was subject to the supervision of the government's Contracting Officer.

Defendants operated the FMPC from 1951 through 1985. They admit that during those years the FMPC discharged uranium into the Great Miami River,[2] into the

---

1. Plaintiffs were conditionally certified as a class by order of this Court (doc. 41). The class is comprised of two subclasses. Subclass I relates to plaintiffs' claims of diminished property value and is limited to owners of real property within a five-mile radius of the FMPC. Subclass II, which concerns plaintiffs' claims of emotional distress, consists of persons who resided or were employed within a five-mile radius of the plant during the relevant time period. A motion for decertification is currently pending (doc. 102).

2. The Great Miami River, located to the east of the FMPC, flows in a South-westerly direction into the Ohio river. One of the Great Miami's tributaries is Paddy's Run, a creek which runs through the FMPC itself.

soil, and into the atmosphere. However, defendants contend that they are not liable for damages allegedly suffered by plaintiffs as a consequence of such emissions. Assuming *arguendo* that liability exists, defendants argue that they are immune from liability under the "government contractor defense." Plaintiffs contend that defendants are liable as a matter of law under the theories of strict liability and nuisance, and that the government contractor defense does not apply to the facts in this case.

## II

Rule 56(c), Fed.R.Civ.P., provides that summary judgment shall be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The moving party has the burden of proof, and "the evidence together with all inferences to be drawn therefrom must be read in the light most favorable to the party opposing the motion." *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir.), *cert. denied*, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979). Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Further, summary judgment may be granted on the issue of liability alone although there is a genuine issue as to the amount of damages. *Hudson*, 600 F.2d at 63, *quoting* Rule 56(c), Fed.R.Civ.P.

## III

Defendants do not dispute that their operation of the FMPC has caused the emission of uranium and other harmful materials into the environment surrounding the plant. Indeed, the government's studies have documented contamination of offsite air, soil, surface water and ground water. Therefore, in compliance with *Celotex*, we must determine whether plaintiffs have established the essential elements of liability under the theory of strict liability or nuisance.

The Restatement (Second) of Torts § 519 (1977) establishes the elements of strict liability for harm caused by abnormally dangerous activity as follows:

(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.[3]

The following factors are relevant to determining whether an activity is abnormally dangerous:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is out-weighed by its dangerous attributes.

Restatement (Second) of Torts § 520.

We have little difficulty in concluding that the operation of the FMPC is an abnormally dangerous activity. The comments to the factors (a), (b), and (c), section

---

**3.** The doctrine of strict liability for abnormally dangerous conditions and activities was derived from *Rylands v. Fletcher*, L.R. 3 H.L. 330 (1868), which held a defendant liable for the damage his "non-natural" use of his land caused to the plaintiffs' adjoining land, despite the fact that defendant was not negligent. *See* W. Prosser, Law of Torts § 78, at 505 (1978). This principle has been adopted in Ohio. *Bradford Glycerine Co. v. The St. Mary's Woolen Mfg. Co.*, 60 Ohio St. 560, 54 N.E. 528 (1899). We agree with Professor Prosser that claims based on use of nuclear energy are subject to analysis under the *Rylands v. Fletcher* doctrine, Prosser, § 78, at 516, and apply the Restatement of that doctrine as articulated in section 519.

520, listed above, note that these factors are satisfied by activities involving atomic energy, and we agree with the reasoning of the American Law Institute as expressed in these comments. The production of uranium is clearly not a matter of common usage, as it is not "customarily carried on by the great mass of mankind or by many people in the community." Restatement (Second) of Torts § 520, Comment on Clause (d). The production of uranium metals at the FMPC is inappropriate to the place where it is carried on, because the government and defendants recognized when the plant was built that some hazardous materials would seep into property, springs, rivers, and wells owned or utilized by the neighboring public, and such production is clearly within the meaning of "nonnatural use" as described in *Rylands v. Fletcher*.[4] Finally, there is no indication that the FMPC's value to the Fernald community is greater than the danger it represents. Accordingly, we have no doubt that Ohio courts would consider the production of uranium at the FMPC an abnormally dangerous activity. *See Silkwood v. Kerr-McGee Corp.*, 667 F.2d 908, 921 (10th Cir. 1981), *rev'd on other grounds*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984); *Carolina Environmental Study Group v. United States*, 431 F.Supp. 203, 223 (W.D.N.C.1977), *rev'd on other grounds*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).

Having concluded that defendants engaged in abnormally dangerous activity at the FMPC, we consider whether plaintiffs have established each element of strict liability under section 519, Restatement (Second) of Torts. Again, section 519 provides that:

(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

■ Defendants argue strenuously that no finding of liability is proper absent a showing of cognizable injury and that emotional distress and diminished property values are not cognizable injuries compensable under the *Rylands v. Fletcher* strict liability doctrine. Further, they contend that emotional distress and diminished property values are not the "kind of harm, the possibility of which makes the activity abnormally dangerous." Restatement (Second) of Torts § 519(2).

■ Emotional distress will support a claim of strict liability in Ohio. *See Lavelle v. Owens–Corning Fiberglas Corp.*, 30 Ohio Misc.2d 11, 507 N.E.2d 476 (C.P.1987) (court denied motion to prohibit introduction of evidence regarding emotional distress resulting from increased fear of cancer in a personal injury case based upon exposure to asbestos and premised on Restatement (Second) of Torts § 402A). Our decision in *Cincinnati Gas & Electric Co. v. General Electric Co.*, 656 F.Supp. 49 (S.D.Ohio 1986), which defendants cite for the contrary proposition, is inapposite. *CG & E v. GE* involved the sale of an allegedly defective nuclear steam supply system, which alleged defect cost the buyer millions of dollars for redesign and reconstruction. We refused to permit buyer to recover those costs under § 402A, Restatement (Second) of Torts, holding that Ohio courts would not permit recovery under a strict liability theory for such purely economic loss where the parties were in privity of contract and there was no property damage or personal injury. *CG & E v. GE*, 656 F.Supp. at 58. The instant action does not involve a defective product. It concerns loss directly attributable to defendants' abnormally dangerous activities at the FMPC; activities which allegedly damaged plaintiffs' emotional states and their property

---

**4.** Further, as the Restatement makes clear, the "use of atomic energy" is among the few activities which "necessarily and inevitably involve major risks of harm to others, *no matter how or where they are carried on*." Restatement (Second) of Torts § 520, Comment on Clauses (a) and (b) (emphasis added).

values.[5] We decline to graft the holding of a case primarily sounding in contract, *see CG & E v. GE*, 656 F.Supp. at 56, onto a case arising under the tort-based doctrine of *Rylands v. Fletcher*, and accordingly find that plaintiffs have alleged a cognizable injury compensable under the strict liability theory of section 519, Restatement (Second) of Torts.

 Property damage will also support a claim of strict liability in Ohio. *Walczesky v. Horvitz Co.*, 26 Ohio St.2d 146, 269 N.E.2d 844 (1971) (holding the user of explosives strictly liable for damages proximately caused to adjoining property; petition for relief included claim of "deprivation" of property value). Contamination by uranium, diminishing the value of one's property, constitutes compensable property damage. *See Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1212 (6th Cir. 1988) (allowing damages, *inter alia*, for diminution in property values due to contamination from hazardous chemicals). Again, we conclude that plaintiffs have alleged a cognizable injury compensable under the doctrine of strict liability.

Finally, defendants cite *CG & E v. GE* as support for their argument that plaintiffs cannot recover because their injuries are not "the kind of harm, the possibility of which makes the activity abnormally dangerous." Restatement (Second) of Torts § 519(2). However, as stated above, *CG & E v. GE* is inapposite. The *CG & E* plaintiffs sought recovery of the cost of repair and/or redesign incurred due to defendants' defective product. Such economic loss was not the kind of harm which would have made operation of the nuclear plant at issue abnormally dangerous. Conversely, the seepage of uranium and other dangerous materials onto surrounding property, as alleged in the instant case, is the kind of harm which renders operation of the FMPC abnormally dangerous. Imposition of strict liability under these circumstances is justified.

Accordingly, defendants' motion for summary judgment is denied insofar as it concerned plaintiffs' strict liability claims. Further, we conclude that plaintiffs' motion for summary judgment on their strict liability claim should be denied as there is a genuine issue of material fact regarding the existence of emotional distress or diminished property values. If the evidence of emotional distress and/or diminution in property values was undisputed, we would grant plaintiffs' motion for partial summary judgment. However, because harm is an element of plaintiff's strict liability claim and is not solely relevant to the damages issue, summary judgment as to liability is not appropriate here. *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. at 2552.

IV

 Plaintiffs also seek summary judgment on grounds that defendants maintained a private, absolute and permanent nuisance. The Restatement (Second) of Torts § 822 defines the elements of a private nuisance as follows:

> One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either
>
> (a) intentional and unreasonable, or
>
> (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or *for abnormally dangerous conditions or activities.*

Restatement (Second) of Torts § 822 (1979) (emphasis added). Similarly, Ohio courts impose strict liability for creating an absolute nuisance caused by the escape of inherently dangerous material from one's land onto the land of another which injures the other's legal rights. *Taylor v. City of Cincinnati*, 143 Ohio St. 426, 55 N.E.2d 724 (1944), *citing Rylands v. Fletcher.*

 We have already determined that defendants are engaging in abnormal-

---

**5.** We are not commenting on plaintiffs' claims for negligent infliction of emotional distress. Those claims require findings of fact that are to be left to the jury. *Paugh v. Hanks*, 6 Ohio St.3d 72, 80, 451 N.E.2d 759, 767 (1983).

ly dangerous activity at the FMPC. Plaintiffs allege that defendants' acts at the FMPC constitute a nuisance that has caused them emotional distress and diminished the value of their property. Emotional distress and diminished property values are cognizable injuries giving rise to a cause of action for nuisance. *See Widmer v. Fretti*, 95 Ohio App. 7, 17, 116 N.E.2d 728, 735 (1952) (recognizing that "[t]he personal inconvenience, annoyance or discomfort to the occupant of real estate caused by the maintenance of a nuisance in the immediate vicinity is a separate and distinct element of damage from that of the depreciation of the real estate itself"). However, as with strict liability, harm is an element of plaintiffs' nuisance claim; there can be no liability without significant harm. Restatement (Second) of Torts § 821D comment d; *see Taylor*, 143 Ohio St. at 440, 55 N.E.2d 724; *Rautsaw v. Clark*, 22 Ohio App.3d 20, 488 N.E.2d 243 (1985). Because there are contested issues of fact regarding this element of plaintiffs' claim, plaintiffs' motion for partial summary judgment on this issue must also be denied. *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. at 2552.

■■■ Defendants seek summary judgment on the nuisance claims on grounds that work which is "authorized by competent legal authority cannot constitute a nuisance." *Ware v. City of Cincinnati*, 93 Ohio App. 431, 111 N.E.2d 401 (1952). Although what is authorized by law cannot be a *public* nuisance, "it may nevertheless be a *private* nuisance, and the legislative authorization does not affect any claim of a private citizen for damages for any special inconvenience and discomfort caused by the authorized act not experienced by the public at large...." 72 O.Jur.3d Nuisances § 14 (1987) (emphasis added); *see Walczesky*, 26 Ohio St.2d at 149, 269 N.E.2d at 846 (holding, in a case brought under the *Rylands* doctrine, that authorization to do an act could not be said to include authoriza-

tion to damage adjoining property when performing said act). Because defendants' actions, if proven, would give rise to a private nuisance,[6] *see generally* Restatement (Second) of Torts §§ 821B and 821D; 72 O.Jur.3d Nuisances § 6, defendants' argument fails. Accordingly, their motion for summary judgment with regard to the nuisance claim is denied.

### V

■■■ Having concluded that plaintiffs have stated cognizable state law claims, we turn to defendants' argument that the Government Contractor Defense bars those state law tort claims. The Government Contractor Defense immunizes from liability a contractor who performed an act pursuant to instructions from the federal government, which act would render the contractor liable under state law. In *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), the Supreme Court held that state law, which would hold the contractor liable, will be displaced when (1) the subject matter involves "uniquely federal interests"; and (2) "a 'significant conflict' exists between an identifiable 'federal policy or interest and the [operation] of state law' ... or the application of state law would 'frustrate specific objectives' of federal legislation...." *Id.* 108 S.Ct. at 2515 (citations omitted). If these two threshold requirements for displacement are met, the scope of such displacement is determined by considering the following three limiting factors:

1. government approved specifications,
2. conformity to specifications, and
3. contractor warning of dangers it knew of which were unknown to the government.

*Id.* at 2517.[7]

Plaintiffs argue that defendants cannot satisfy the threshold requirements for dis-

---

6. A public nuisance is an unreasonable interference with a right common to the general public. Restatement (Second) of Torts § 821B. It arises out of a violation of public rights or the doing of unlawful acts. 72 O.Jur.3d Nuisances § 6. A

public nuisance may also constitute a private nuisance. *Id.*

7. Although the *Boyle* court discussed the government contractor defense within the context of a procurement contract, the defense is viable with

placement of state law. Although conceding that operation of the FMPC involves a uniquely federal interest, that of national defense, plaintiffs contend that there is no significant conflict between federal and state laws or interests. Specifically, they claim that defendants' actions giving rise to the state law tort claims also violated applicable environmental laws, and therefore the "significant conflict between federal interest and state law," required for displacement of state law under *Boyle*, 108 S.Ct. at 2517, does not exist. Defendants agree that if plaintiffs prove that actions undertaken by defendants which are relevant to plaintiffs' claims also violated applicable environmental laws, the government contractor defense would not apply to shield defendants from tort liability for those actions. Defendants' reply brief, doc. 143, p. 7. We agree with the parties' analysis,[8] and therefore consider the laws pertinent to defendants' operation of the FMPC.

The evidence adduced at the hearing demonstrated that uranium contamination was and is present in the soil, air and water surrounding the FMPC. Plaintiffs contend that this pollution violates the Refuse Act of 1899, 33 U.S.C. § 407, Standards for Protection Against Radiation, 10 C.F.R. Part 20 (1988), and the Atomic Energy Commission's ALARA ("as low as reasonably achievable") policy.

The Refuse Act of 1899 provides in part as follows:

It shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or deposited ... from the shore, wharf, manu-facturing establishment, or mill of any kind, any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state, into any navigable water of the United States, or into any tributary of any navigable water from which the same shall float or be washed into such navigable water....

33 U.S.C. § 407.

Section 407 imposes a flat bar on the unauthorized deposit of foreign substances in navigable waters, regardless of the effect on navigation. *United States v. Pennsylvania Indus. Chemical Corp.*, 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973). Defendants concede that "waste water" containing uranium was discharged from the plant into the Great Miami River through a discharge pipeline and a storm sewer system. They contend that these emissions fall under the streets and sewers exception embodied in the Act.

The streets and sewers exception is narrowly construed to mean only domestic sewage. *See United States v. Colgate–Palmolive Co.*, 375 F.Supp. 962, 968 (D.Kan.1974), citing *United States v. Republic Steel Corp.*, 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960). Industrial waste is excluded from the exception. *United States v. Genoa Cooperative Creamery Co.*, 336 F.Supp. 539, 541 (W.D.Wis.1972), citing *Republic Steel*, 362 U.S. at 491 n. 6, 80 S.Ct. at 890 n. 6. Thus, defendants violated the Refuse Act when they discharged uranium into the Great Miami River.[9]

---

regard to performance contracts. *See Boyle*, 108 S.Ct. at 2514; *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940).

**8.** The Supreme Court defined the parameters of the "significant conflict" requirement by reference to the discretionary function exemption to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680(a). Thus, for the government contractor defense to apply, the court must find that the discretionary function exception to the FTCA would bar any liability on the part of the United States. We agree that the operation of the Fernald plant required an exercise of government discretion in balancing safety concerns against security considerations. However, there is no discretion to violate specific environmental standards, *Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), and if such violations occurred, the defense does not apply.

**9.** Regardless of whether the Great Miami River is navigable water, *see United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940), it flows into the Ohio River, and as such is a tributary of navigable water under the Act.

■ The AEC has established by regulation maximum permissible releases of source materials [10] into the environment. 10 C.F.R. § 20.106 and App. B, Table II; [11] *see Train v. Colorado Pub. Interest Research Group,* 426 U.S. 1, 6, 96 S.Ct. 1938, 1940, 48 L.Ed.2d 434 (1975). This regulatory scheme is pervasive, and is intended to exclusively regulate the discharge of radioactive effluents from nuclear plants. *See Northern States Power Co. v. Minnesota,* 447 F.2d 1143 (8th Cir.1971), *aff'd,* 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972). The evidence in the instant case shows that defendants exceeded the dose limits set by the applicable regulations. For example, the DOE recognized that airborn uranium from the FMPC had travelled offsite in heavy concentrations, thereby violating the "as low as reasonably achievable" (ALARA) requirement codified at 10 C.F.R. 2.0.1. The DOE's own reports verify that it was aware of radon releases from storage silos which exceeded limits set by the Environmental Protection Agency (EPA). *See* 40 C.F.R. 61. Further, internal reports at the FMPC reflect that above background concentrations of uranium were present in offsite wells, surface water, and ground water. *See* 10 C.F.R. 20.106 and App. B, Table II. Under these circumstances, we conclude that defendants also violated applicable AEC emission regulations.

Because defendants violated pertinent environmental laws by discharging radioactive material into the environment surrounding the FMPC,[12] there is no conflict between state tort law and the federal interests at issue here. Therefore, the government contractor defense does not apply to shield defendants from liability for those emissions, and their motion for summary judgment hereby is denied.[13]

## VI

■ Finally, defendants move for summary judgment on plaintiffs' claims for punitive damages. Defendants claim that recent amendments to the Price–Anderson Act, Pub.L. No. 100–408, 102 Stat. 1067 (1988), prohibit punitive damages in cases such as this. Section 14 of the Act provides that "no court may award punitive damages in any action with respect to a nuclear incident or precautionary evacuation against a person on behalf of whom the United States is obligated to make payments under an agreement of indemnification covering such incident or evaluation." However, section 14 applies to nuclear incidents occurring on or after the date of enactment of the Price–Anderson Amendments Act of 1988. Price–Anderson Amendments Act of 1988 § 20. Because the Act became effective on August 20, 1988, section 20 has no application to the instant case. Accordingly, defendants' motion for summary judgment on the punitive damages claim is denied.

## VII

For the foregoing reasons, defendants' motion for summary judgment hereby is denied. Plaintiffs' motion for partial summary judgment also is denied, as the existence of harm is a disputed factual element of plaintiffs' case. However, given our disposition of the parties' cross-motions, the case shall proceed to trial only on the issues of harm and damages. No evidence need be introduced on other issues concern-

10. "The term 'source material' means (1) uranium ... or (2) ores containing [uranium], in such concentration as the [Atomic Energy] Commission may by regulation determine from time to time." 42 U.S.C. § 2014(z).

11. Although 10 C.F.R. Part 20 explicitly applies to licensees, it applies by Executive Order to government owned, contractor operated facilities. Executive Order 11752, 3 C.F.R. 833 § 4(a)(6) (1971–1975).

12. Given our finding concerning emissions of radioactive material, we do not consider the

arguments advanced by both sides regarding non-radioactive discharges.

13. If the *Boyle* threshold requirements were met, the contractor defense could be defeated on grounds that NLO/NLI did not conform to government approved specifications for operation of the FMPC. However, we will not decide this question, as we are firmly convinced that the defense must be disallowed on the grounds explained above.

ing liability or on the government contractor defense.

SO ORDERED.