John **DOMBROWSKI**, et al., Plaintiffs,

v.

**GOULD ELECTRONICS, INC.**, Defendant.

No. 3:CV–93–0120.

United States District Court, M.D. Pennsylvania.

Feb. 3, 2000.

Gerald Williams, Philadelphia, Pa., John B. Beemer, Clark's Summit, Pa., for plaintiffs.

G. Wayne Renneisen, Philadelphia, Pa., Mark A. lockett, Philadelphia, Pa., for defendant.

CONABOY, District Judge.

**INDEX**

|       |                                                                    |     |
|-------|--------------------------------------------------------------------|-----|
| I.    | OPINION AND VERDICT                                                 | 457 |
| II.   | APPLICABLE LAW                                                      | 458 |
| III.  | DISCUSSION OF PLAINTIFFS' TESTIMONY                                 | 459 |
| IV.   | PLAINTIFFS' EXPERT TESTIMONY ON INJURY AND INJURY CAUSATION         | 466 |
| V.    | DISCUSSION OF DEFENDANT'S TESTIMONY ON MEDICAL CAUSATION            | 469 |
| VI.   | DEFENDANT'S TESTIMONY ON ENVIRONMENT, INJURY AND CAUSATION          | 472 |
| VII.  | WITNESSES—WEIGHT AND CREDIBILITY                                    | 474 |
| VIII. | DISCUSSION AND FINDINGS                                             | 476 |
| IX.   | INJURY—CAUSATION                                                    | 477 |
| X.    | DAMAGES                                                             | 477 |
| XI.   | VERDICT                                                             | 478 |

## I

### *OPINION AND VERDICT*

From 1962 to 1980 the Marjol Battery and Equipment Company operated a battery lead recycling plant in Throop, Pennsylvania. In 1980, the Defendant in the cases we consider here, Gould Electronics, Inc. (hereinafter "Gould") purchased the site and operated it until April, 1982. The escape of lead emissions from the site has caused a multitude of lawsuits and much legal wrangling for property damage, personal injury and land restoration.

Pursuant to an agreement of the parties, this Court, without a jury, (November 1, 1999 to November 10, 1999) heard the claims of five young individuals from three families for damages for personal injuries, principally in the nature of learning disabilities. The damages were allegedly caused by lead emissions from the Marjol site.

In four of the five cases (Benjamin Doyle, Angeleen Doyle, Justin Miller and Joseph Miller) we find the Plaintiffs have proved their injuries and the cause of those injuries and will award damages to each of them.

In the fifth case (Thomas A. Lukasewicz) we find the Plaintiff has failed to prove an injury and is not entitled to damages.

As the basis of this lawsuit, the five personal injury Plaintiffs named above claim their exposure to lead escaping from the Marjol premises, was a substantial factor in causing measurable learning disabilities. Plaintiffs claim further that these disabilities have caused them to suffer emotionally, to fail in academic perfor-

mance, and to suffer behavioral problems. They each allege these conditions have resulted in familial problems, other disturbances in their daily lives, and limitations on their abilities to compete academically and economically. Finally, they claim they are entitled to an award of damages which will adequately compensate them for these injuries. (See Plaintiffs' pretrial memorandum dated 10/27/99).

The Defendant in this action has agreed to several significant matters: First, that lead was released from the Marjol site and secondly, that the Defendant was negligent in allowing the release of these emissions. They have denied liability to the Plaintiffs however, arguing as follows: (1) that the Plaintiffs have not been exposed to significant background levels of lead; (2) that the Plaintiffs have not been injured due to their alleged exposure to lead; (3) that the exposure to lead from the Marjol site was not the cause of the injuries claimed; and (4) that if the Plaintiffs were exposed to lead and were injured, the lead which caused the injury can be attributed to other sources (e.g. lead paint). (See trial brief of Defendant filed 11/23/99, page 4.)

After a number of meetings with counsel and before the trial I proposed an "outline" for the trial—setting forth the obligations and burdens of proof of both parties. Counsel for both sides approved and adopted the outline. We used it as a guide in the presentation of the case and I set it forth here, since it is essentially a road map for the opinion and verdict.

Outline of Non Jury Trial

From Defendant's Position:

For the sake of these trials, the Defendant will admit:

1. That it operated a battery crushing facility at the Marjol location in Throop, PA.

2. That in the course of that operation lead was released from the crushed batteries.

3. That some of the lead escaped and contaminated not only the Marjol premises, but the air and soil in the surrounding community.

4. That certain levels of lead in the human body can be dangerous and can cause damage.

Assuming Defendant admits the foregoing, the Plaintiffs then must proceed to prove certain items, as follows:

1. There must be proof that each individual Plaintiff suffered some type of physical damage.

2. Each Plaintiff must prove the extent of that damage.

3. Each Plaintiff must prove the cause of the damage.

3.1 In these cases the Plaintiff must prove that the escaping lead caused the damage.

4. Each Plaintiff must prove the value of the damage or loss to the individual Plaintiff.

Assuming there is proof of each of the foregoing items in each Plaintiff's case, the Defendant may counter by attacking as follows:

1. The Defendant may contest the assertion that there was any damage at all to individual Plaintiffs.

1.1 The Defendant may contest the extent of the alleged damage to individual Plaintiffs.

2. The Defendant may contest the cause of the damage to the individual Plaintiffs.

3. The Defendant may contest the value of the harm done to the individual Plaintiffs.

## II

### *APPLICABLE LAW*

There is no dispute between the parties as to the law that applies to their presentation of the case, their burden of proof and the guidelines that will govern this Court's determination of the various claims presented.

Reference to the brief of the Plaintiff and the brief of the Defendant will exemplify this agreement.

In Plaintiffs' post-trial brief dated November 23, 1999, it is outlined as follows:

A. *Elements of Proof*

In the Three Mile Island litigation, the Third Circuit Court of Appeals set forth the four elements of a toxic tort personal injury case: 1) breach of duty; 2) exposures to defendant's toxin; 3) injury; and 4) causality. *In re TMI*, 67 F.3d 1103, 1118–19 (3d Cir.1995). These elements were reiterated in the Court's most recent pronouncement on the subject. *In re TMI Litigation*, 193 F.3d 613 (3d Cir.1999). Of course, once the basic elements have been established, the appropriate monetary compensation in each claim is determined in light of the additional factor identified by this Court in pretrial proceedings: the "extent of damage."

In the Defendant's trial brief dated November 23, 1999, the following reference is made to the law governing this case:

B. *Applicable Law*

Plaintiffs' burden of proof in a toxic tort case is well documented in this Circuit. It has been determined that these Plaintiffs seeking to recover for injuries allegedly caused by their exposure to a toxic substance (lead), must demonstrate that: (1) Marjol released lead into the environment; (2) that Plaintiffs were exposed to lead emitted from Marjol; (3) Plaintiffs have injuries; and (4) lead emitted from Marjol was *the cause* of those injuries. *See, In re TMI*, 67 F.2d 1103, 1119 (3d Cir.1995), *cert. denied*, 516 U.S. 1154, 116 S.Ct. 1034, 134 L.Ed.2d 111 (1996); *Hines v. Consolidated Rail Corp.*, 926 F.2d 262, 275 (3d Cir.1991); *In re Paoli Railroad Yard, PCB Litigation*, 916 F.2d 829, 860 (3d Cir.1990). The Third Circuit has also de-termined that the "exposure element requires that Plaintiffs demonstrate that they have been exposed to a greater extent than anyone else, i.e. that their exposure levels exceeded the *normal background level* ". *Id.*[1] This is particularly instructive in this case since lead also occurs naturally in the environment and is present from a variety of sources in an urban area.

### III

### *DISCUSSION OF PLAINTIFFS' TESTIMONY*

As indicated above, the Defendant admitted the Marjol operation created the existence of lead and that it was negligent in causing the lead to contaminate much of the Throop Borough area. The Defendant also admitted that lead, at or about certain levels, in the human body, can cause injury.

In this case, however, the Defendant denied there was a dangerous or harmful level of Marjol lead on any of the properties where the involved parties lived. They denied the individual Plaintiffs have harmful levels of Marjol lead in their bodies, and they argued that the Plaintiffs had no damage attributable to Marjol lead.

To prove they were exposed to dangerous levels of Marjol lead; that they have dangerous levels of lead in their bodies; and that these lead levels caused injury and damage to them, the Plaintiffs called a number of witnesses.

*Edward Shoener* testified as an expert witness on the existence, the amount, and the source of lead in the community and at the properties where the Plaintiffs lived. He testified he lived in Scranton, Pennsylvania and presently operates a business from his home known as ECO US, an environmental company incorporated in 1994. He stated he does environmental consulting with clients in the United States and is involved in a partnership which does

---

1. This standard was recently reaffirmed by the Third Circuit in *In re TMI*, 193 F.3d 613 (3d Cir.1999).

the same type of environmental advising in Lithuania and other foreign countries. He advises on such things as sewer installations, pollution control and management of environmental problems.

He testified he is a graduate of Penn State University with a B.S. in Environmental Studies and a Masters Degree in Environmental Studies.

He also reviewed his pertinent employment stating he had been employed by both the United States Environmental Protection Agency and the Pennsylvania Department of Environmental Resources for many years, involved in pollution control, air regulations, dispersal of pollutants, cleanup, superfund programs, and enforcement. He pointed out he worked with all sorts of specialists in all of these fields, some of whom worked for him when he became head of the regional office in Northeastern Pennsylvania for the Pennsylvania Department of Environmental resources. He testified he administered all of the Department of Environmental Resources' programs in 11 counties of Northeastern Pennsylvania and had many engineers and specialists on his staff who reported and made their reports to him, all of which he was required to review and digest. He also stated lead was a common problem at many of the sites where he was involved and he became familiar with its source, its dispersion and concomitant problems it produced.

He testified he was very familiar with the Marjol site and indeed supervised those who inspected and checked the site and was required to read and review reports of many who were involved on the site and with the problem of lead contamination in the surrounding area.

He also testified about the breadth of his work in Northeastern Pennsylvania and his familiarity with the environmental problems of the area and, particularly, with lead emissions, and lead contamination from various sources.

He testified lead was a natural bi-product of the Marjol battery crushing operation that caused and allowed lead to be carried off the premises and deposited in a wide swath across the Throop community including the properties where the Plaintiffs lived. He stated one source of distribution was air currents. He added, while the general wind pattern in that area was in a Northeasterly direction, the wind blew in many directions on various occasions and scattered deposits in many directions around the community.

Based on his experience with this locale in general—the reports he reviewed—and his general knowledge of Northeastern Pennsylvania, he stated the average background lead level in Throop was about 100 parts per million ("ppm").[2] He further testified, in his opinion, the higher lead levels found on the Plaintiffs' properties came from the Marjol site. He stated the lead deposits on each of the properties was far beyond normal background levels and created a danger to the inhabitants, including the Plaintiffs.

On cross examination he acknowledged the experience and background of Defendant's experts—but disagreed with their technical process and results. He reiterated his opinions were based on years of experience as well as training and expertise—and his direct work with the site and those involved in its investigation and inspection.

*Mrs. Shirley Doyle* testified she lives at 840 Murray Street in Throop, Pennsylvania[3], a property acknowledged to be within

2. Throughout this Opinion we refer to two measurement devices; ppm refers to a measurement used to determine the amount of lead in soil and ug/dl refers to comparative measurements of the amount of lead in blood.

3. She acknowledged that while there were other rooms in the house, a number of them had been occupied as a separate apartment by her father for many years.

2500 feet of the Defendant site.[4]

She stated she is the mother of 11 children, including two Plaintiffs, Angeleen, who was born on December 27, 1980 and Benjamin, who was born on March 13, 1984, who all were raised at that address. She testified (and a view confirmed her testimony) that hers was a very modest home, which included three bedrooms during the time all of their children were at home.

A high school graduate, she described herself as an average student and stated seven of her children withdrew from school before graduation. She described the exterior yard of the house, indicating that over time a home grown garden existed and was maintained by the family as well as an above-ground swimming pool. She testified all of her children, including the two Plaintiffs, in particular, played in and were exposed to the dirt and dust on all parts of the property and they also consumed vegetables from the garden area. She also testified one of her other sons, for a period of time, worked at the Marjol site and often came home covered with dust from the work place and dropped his clothes about the house and she included those clothes in her normal laundry with all of the rest of the family's clothing. She also testified her children played in various places throughout the community in the course of their life activities and were required to move about all parts of the community on a daily basis.

Regarding her daughter, Angeleen, one of the Plaintiffs in this case, she stated, while she had some problems with comprehension, her early years in school were not remarkable, but became more difficult by the time she reached the 6th and 7th grades. She testified Angeleen had considerable difficulties when she reached the 8th and 9th grades and her marks began to "drop below C" and she failed many

courses in the 9th grade. She stated that in her 10th year Angeleen's averages continued to drop, but she was never classified as a "special ed" student.

She stated Angeleen was never a disciplinary problem at home, but comprehension problems continued to develop all through her later school years and Angeleen recently quit school while she was in the 12th grade. She acknowledged some of the difficulties in these later years of Angeleen's life were caused by one of her sons who had some difficulties that caused him to stay up late during the night talking and making noises and disturbing some members of the family. She stated Angeleen recently moved out of the family home to move in with her boyfriend in Carbondale, Pennsylvania. She stated Angeleen liked and wanted to continue in school, but as she moved into the upper grades, she continued to have very noticeable and difficult comprehension problems and learning became much more difficult for her.

Regarding her son, Benjamin, Mrs. Doyle testified, among other things, he had hearing problems almost since birth, even though she suffered no pregnancy or birth irregularities at the time of his birth. She testified, beginning in kindergarten, Benjamin had a hard time understanding anything that was being taught; he spoke very fast; and he had problems in recalling anything from his schooling as a result of these difficulties. She stated he did not do well in 1st grade and was placed in special ed and required to repeat the 1st grade. She described him as a person who had a great deal of difficulty doing any type of homework; he had a very hard time comprehending and understanding; and he became very frustrated when he couldn't do the work or understand the work that was given to him. She testified, as a result, he had a high absentee rate

4. We note the distance only to establish proximity to the Marjol site. One count of Plaintiffs' complaint is based on the Pennsylvania Hazardous Sites Cleanup Act (35 P.S. § 6020.1109), but we need not reach that issue since we find Plaintiffs have proved their claims under negligence standards.

because he was often sick and did not want to go to school. She testified he resents being in special ed and being called names by his friends, etc. and acknowledged he is probably a discipline problem in school because he gets in fights, particularly when others pick on him, and he has been suspended very often since the 7th grade.

She acknowledged some experts would say there is not enough done at home to help her children, particularly with their school work, but she insisted, when school authorities called her and brought any matters to her attention, she tried to help and that she does the best she can as a parent to encourage her children to stay in and to do well in school. She said, however, she worries about Benjamin because he doesn't write very well and she wonders how he will ever be able to make a living because of his inability to learn or to comprehend what is being taught.

*Angeleen Doyle,* testified she presently lives at 7 Belmont Street in Carbondale, that she has been there approximately 2 weeks since she withdrew from the Mid Valley School; and that she had spent the rest of her life at the Murray Street address with her family.

She testified she withdrew from the Mid Valley School because she was frustrated with her work and wanted to get away from that frustration and other frustration in her home because of her brother's conduct. She testified she was in the 12th grade when she withdrew from school; she is presently living with her boyfriend in Carbondale, and her plan is to resume school hopefully to get into the Carbondale Area School and finish her high school education. She stated she hopes to graduate from high school and go on to someplace like the Luzerne County Community School to learn to be a photographer or perhaps to study psychology.

She stated she spent a great deal of her early years playing in their yard and got very, very dirty and the dust and dirt from the yard and surrounding areas not only got all over her clothing, but all over her body, and further that she used the playgrounds and streets in the community all through her life. She pointed out, while she did fairly well in the early grades in school, commencing in the 6th grade she had very difficult memory problems, particularly in math, and also she found it difficult to get any extra help. She could not recall her exact grades, but indicated beginning in the 7th grade her marks continued to fall from Cs to Ds and things got much more difficult for her because she failed to comprehend what was being taught; she became overwhelmed and frustrated. She stated learning gets more difficult for her as she progressed into higher grades and she continues to have a very difficult time comprehending whatever she reads, even though she insisted she would like to continue on and complete school.

On cross examination she reviewed some of her past conduct, such as playing in her yard and near her home and also stated she was never in special ed classes. She did testify that from the 7th grade on, her tardiness and absenteeism grew, and her grades dropped and she found high school overwhelming. She stated she worked part-time at a few jobs, but eventually left or was actually fired from some of those jobs because of absenteeism.

She portrayed herself as an individual who, while desiring to continue her education and to learn, has an extremely difficult time in comprehending and understanding any assignments given to her or any matters discussed in the classroom.

*Benjamin Doyle,* testified he continues to live at home with his family at the Murray Street address in Throop, Pennsylvania, and that he was born on March 14, 1984. He testified he played throughout his life not only in his own back yard, but in the entire neighborhood and at the various playgrounds in Throop, Pennsylvania, although he acknowledged he never played at the Marjol site itself. He testified, in the course of playing in his yard,

and throughout the neighborhood, he got quite dirty and the dust and dirt from the various areas of his yard and the community covered his body at times as he played and rode his bike continuously.

Regarding school he stated, while he had no problem in kindergarten, the teacher in 1st grade was "mean to him" and "he got in a little trouble because the teacher didn't like him". He testified in 3rd grade he was transferred to special ed and placed in a different classroom and he exhibited disappointment and anger that he continues to be in special ed since he feels he could learn more if he was in regular classes.

While he felt special ed was not challenging to him and he was only doing "3rd grade stuff", he had almost no recollection of any subject he was studying in school when asked questions about specific studies or what he hoped to do. He exhibited very little connection with his school studies or the courses he is taking in high school, although he indicated his hopes to finish high school. He testified he "missed the van" which takes him to school very often and was often late for school on the days he did attend.

*Linda Miller,* testified she lived at 311 Rebecca Street, Throop, Pennsylvania, (acknowledged to be within 2500 feet of the Marjol site),[5] since 1984 with her husband and two sons, Justin, who was born in 1983 and Joseph, who was born in 1986, both Plaintiffs in this case.

Regarding the conditions at her property, she stated they had problems from dust and dirt, not only from emissions from the Marjol site, but from trucks that traveled back and forth on her street over a long period of time. She stated her children continually played in the yard and the dirt in the surrounding community. She also stated the children played near the Marjol site and a considerable amount of dirt accumulated on the water in their swimming pool in their back yard.

She testified there was no lead paint in their home, but this changed rather significantly in later testimony on cross examination. She also stated that Justin had blood level readings which ran from 3 to 14 and that Joseph had readings which ran from 6 to 25.

Regarding Justin, she testified she noticed problems even prior to his beginning school in that he had very poor attention and poor focus on the various items she tried to teach him. She testified in the 1st grade he had poor comprehension and poor attention problems which led teachers to believe he might have some physical difficulties, but these matters were later ruled out. She stated he had to repeat 1st grade because of his behavior; that he could not sit still; and he talked continually, etc. He failed to improve and continued to make noise and was eventually detained in both 6th and 7th grades. He was placed in some special ed classes and eventually became a full time special ed student. She stated he becomes very angry and throws things in class and finds every day a struggle because he is failing so miserably. She stated in the early grades he was diagnosed as having learning disabilities; that he is now 16 years old in the 9th grade and while his curriculum is somewhat scaled down, he still has a very difficult time comprehending anything in the school curriculum. She said he exhibits general anger and frustration with his continued inability to learn and she is afraid he will not be able to be self supporting as he grows older.

Regarding her son Joseph she testified he also had problems in his early life and he could not sit still even to try to learn numbers, etc. before he began school. She testified problems surfaced with Justin immediately in kindergarten and he was required to repeat kindergarten because of a lack of comprehension and poor behavior. She stated, since kindergarten, part of his classes were special ed classes and he is

---

5. See Footnote # 4.

now in 7th grade and has mostly special ed classes. He still has behavioral problems; he is very poor in math; he has poor reading skills; he is aggressive; he is angry and fights often; and has been suspended many times. She testified Joseph is very hyper; he is a poor sleeper; he is hard to control; and he is very forgetful. She stated further she is extremely worried about his future because of his memory and "problems with authority".

Cross examination of this witness revealed some matters that effect credibility in that there was lengthy questioning and discussion about allegations of truckloads of dirt passing by her property, when it appears any trucks carrying dirt in and out of the Marjol premises never traveled anywhere near the road on which their property is located. Also, under cross examination she initially indicated she was a fair student in school, but production of her school records indicated she in fact did very poorly and missed school a great deal of time, even though she finally graduated from high school.

Cross examination also revealed some significant discrepancies in her testimony about lead in the paint in the home which she and her family occupies. It appears there were findings of lead in the paint in their home and there had been considerable reconstruction work which could have disturbed some of the lead paint and caused it to be distributed in and about their property.

In spite of these inconsistencies, she described significant difficulties in two of the Plaintiffs. There was little evidence—other than speculation that lead from paint caused these difficulties—but there is significant evidence of Marjol's lead contribution and the Plaintiffs' exposure to it.

*Justin Miller* testified he lived at home with his family, including his parents, at 311 Rebecca Street in Throop, Pennsylvania. He testified he is in the Mid Valley High School in the 9th grade. He testified he often played in the family back yard and in the entire community and he built huts up near the fence at the Marjol site and rode his bike all around the community and played in various areas throughout the community.

Regarding school, he said he has had difficulty since 1st grade, particularly with math and with concentration and comprehension, and he is now in the 9th grade and in all special ed classes. He said he still has a very hard time understanding and forgets very easily whatever he reads. He testified his parents over the years tried to help him, but he still has a very hard time in school and finds learning very difficult.

*Joseph Miller* stated he also lives at the family home. He stated he also played in the dirt and dust in the family back yard and throughout the entire community, and he played near the Marjol site, but not actually on the site itself. Regarding school, he testified he repeated kindergarten because he had a hard time learning and from then on he was placed in special ed classes, and he has particular trouble with spelling and reading. He stated he tried to learn, but he "talked all the time" in class and could not force himself to pay attention even though he tried very hard. He testified his "mind goes blank" and he starts "talkin" for no good reason. He stated he was never very expressive and remembering things seems to be a terrible struggle for him. He stated, while he would like to continue in school, he has no thoughts on what he would like to do in the future, except perhaps "go to college".

*Mary Ann Lukasewicz* testified she lived at 316 George Street in Throop, Pennsylvania (which is acknowledged to be within 2500 feet of the Marjol site) with her husband and her son Thomas, who is one of the Plaintiffs in this action. She identified certain exhibits, principally Plaintiffs' exhibits 13 to 23, which showed various readings in and around her home over a period of time from 1988 to 1997, showing readings which range from 55 ppm to 680 ppm She also testified Gould

remediated their yard first in 1992 and again at a later time and also remediated the interior of the home doing usual cleaning and removal of rugs, etc. She testified there was a great deal of dust and dirt that required much double cleaning during the Gould cleanup project in the borough which lasted approximately two years, and the dust and dirt got worse in the Summer months. She described their home as a three bedroom two bath house.

She testified she played in the yards at homes near the Marjol site even before her son was born and she may have had higher levels of lead in her body during the pregnancy with Thomas, Jr., than she realized. She stated after he was born she went near the Marjol site often with her son and she took him near the site after his birth particularly to a playground in that area.

She identified Plaintiffs' Exhibit # 1, which showed blood levels in her son Thomas including a reading of 9 when he was 3 years of age. She testified she tried to teach Thomas "his numbers" and alphabet from the time he was approximately 3 years of age, but he always had poor comprehension, and it was frustrating because he could never seem to concentrate very well.

She described her son in pre-school as being very inattentive and immature and in kindergarten he was slow and continued to be slow in the 1st and 2nd grades. She testified this was very frustrating because Thomas couldn't concentrate or comprehend and as a result he was often fighting and disruptive in class and with other classmates. She said he was hyperactive and out of control at times, and that he got angry when he couldn't learn and fought with her and others because he felt people made fun of him. She stated she always found it difficult to control her son, although her husband had more success in that regard. She stated he is now 14 years of age in the 9th grade and he still has a "big problem" learning because of a very poor memory and a very short attention span. She also described him as being hyper and stated he can't do his homework and has poor comprehension. She stated, because of his immaturity, he has difficulty with such things as crossing the street and simple things like taking care of his own clothing.

This witness' testimony was considerably diminished on cross examination when she acknowledged that Thomas never repeated any grades and was never required to go to Summer school and is an average student. She acknowledged, while her son was in kindergarten through 6th grade in the Mid Valley School, all of his marks were satisfactory or better, and he always did well in arithmetic. She stated in the 9th grade his marks ranged from 84 to 90 and in reading from 84 to 97. She stated her son, who played basketball and soccer, had never been evaluated for any attention deficit disability.

***Thomas Lukasewicz*** testified he lives with his parents at 816 George Street, and is in the 9th grade at Mid Valley High School. He stated he had behavioral problems in 3rd Grade because of not finishing his work and because he was slow. He stated he was never in special ed, but has trouble with math because he finds it very hard and finds it very difficult to learn the "times tables". He testified he is presently taking algebra and he is pretty good in that subject; his only problem is Spanish but he is trying to study a bit harder in that area. He stated he would like to go to college and like to be a baseball player and that he is presently on the golf team at the Mid Valley High School.

A video deposition of Thomas was also played in the course of the trial. The video showed a young man able to comprehend and understand questions asked of him and able to intelligently discuss with his questioners all of the subjects that were broached during the course of the deposition.

On cross examination, he testified he never repeated any grades or had to go to

summer school and that he enjoys using a computer.

## IV

### PLAINTIFFS' EXPERT TESTIMONY ON INJURY AND INJURY CAUSATION

*Edward Bartolic, Ph.D.*, is a Clinical Neurological Psychologist. He is licensed in the State of Pennsylvania and does mostly clinical work. He is an Assistant Professor at Eastern Pennsylvania Psychiatric Institute, part of the Hahnemann Hospital Complex in Philadelphia, Pennsylvania. He is experienced in administering and analyzing standardized tests and performing a variety of exercises to determine a person's memory, as well as their ability at problem solving and their cognitive abilities, as well as task oriented abilities and performances. He said a neurological psychologist has to do with physical nerve and brain problems, as well as the other problems included in plain psychology.

He examined Angeleen Doyle on January 5, 1998 and administered a battery of tests and examinations. She was accompanied by her mother, Angeleen, and "one or two" of her siblings and they were also involved in the interview and the mother was involved in some testing. He was also aware of certain other Doyle Family data, including blood lead levels of various members of the family, including the parents.

He stated, while many of Angeleen's sensory and performance tests results were normal, she had a problem processing information and her verbal learning and memory presented distinct problems. He pointed out she had a full scale IQ of 92, a performance IQ of 107 and a verbal IQ of 83, and stated such a wide difference between the verbal and performance IQS indicated very specific types of difficulties. He testified the verbal score showed auditory retention, concentration, reasoning and social conduct problems. He reiterated that the 24 point spread between the verbal and performance IQS gave him considerable pause for concern and was as signal to him of certain types of dysfunctions. He testified these findings showed some left side brain damage and that she had problems with reading, writing and processing verbal information.

He stated her verbal abilities were poor in general, she had learning and academic problems that derived from her verbal based learning disability. He stated some of these findings could be a cause of her tremendous academic performance drop from the time she was in 7th grade until the time she left school in the 12th grade. He stated her problems worsened with greater challenge academically and intellectually and even her absences from school might in some way be explained by the fact that she was disheartened with how difficult the challenge had become.

He further testified his examination, as well as the literature he has studied, shows that lead is associated with psychological defects and, while he found no specific insults to the brain or to her body in general, lead had to be considered a contributing factor to her problems, since he could find no other factor that would cause such difficulties. His specific opinion was that the lead she ingested at an early age was the cause of her present difficulties.

On cross examination, he acknowledged that motivation, persistence, determination and other matters are important in anyone with any learning difficulties. He acknowledged too that genetics can have an effect on learning ability or cause learning disabilities, but said there is very little data about this and particularly the type of learning disability he found in Angeleen Doyle. He acknowledged he had no records or information on the personal background of Angeleen's mother and that he was not very familiar with the living conditions or the family conduct at the home where Angeleen lived her full life. He added however, that these matters would not interfere with the results he found and

would not cause him to change the results he announced or his opinion on causation.

***Sandra Koffler, Ph.D.*** is a Neuropsychology Specialist. She is licensed in Pennsylvania and is Board Certified. She is associated with the Hahnemann University Hospital and practices with Dr. Bartolic, the prior witness. She saw, tested and examined the other four Plaintiffs in this case. In addition to examining Benjamin Doyle, she saw a variety of hospital and school records and was familiar with the family background. She noted from her interview he had a mild speech delay and some hearing problems, but had no other significant medical history, and she also learned that several other children in the family had learning problems and were in special education classes.

She explained and reviewed all of the tests and examinations she administered to Benjamin Doyle and referred to her report (Exhibit # 41), which incorporated and included a review of all of these tests. She stated Benjamin had been declining in many areas because he was not learning at the same pace as other students academically, and instead of being graded as low average, he approaches the retarded area because he is in fact, learning disabled. She stated his potential for academic and general success would be much better if it were not for this specific deficit. She testified his spelling and reading are now only at the 3rd grade level; that he has problems of inattention and impulsivity; and that these problems contribute to his comprehension ability. She testified, even during testing, he became very testy and frustrated; that the testing was discontinued on several occasions; and that all of this indicates some rather deep-seated hyperactivity disorder inattentive type. She testified his very visible frustration develops from his inability to apply normal attention to schoolwork and other learning activities.

She repeated several times, she could determine nothing in his background, history or examination, other than high blood lead levels that would cause his injury and her findings. She testified her opinion was that the lead levels in his early life were a substantial contributing factor to his present problems.

She examined Justin Miller on January 16, 1997 in the presence of his parents. She reviewed hospital and school records and other matters concerning Justin and found no difficulties in pregnancy or delivery or any other significant developmental problems.

She testified his history shows considerable inattention, failure to finish tasks and poor study habits. Her findings from her examinations and testing were that he has considerable dysfunction, that he reads at a 3rd grade level; that he is learning disabled, most likely an ADHD disorder; predominantly the inattentive type.

She stated these factors lead to a number of difficulties in his life and will continue to make learning a very distinct problem for him for the balance of his life. She testified she found nothing in his background other than high blood lead levels to explain his condition and she stated her opinion that lead is a substantial factor in causing the conditions from which he now suffers. She also testified he will most likely need additional services in the future to be able to cope with the normal problems and learning habits of life.

She examined Joseph Miller on January 16, 1997 with his parents present and in Joseph's case she also found no problems with pregnancy or birth which would cause any difficulties.

She testified about a number of the tests she gave to him and pointed out the vast differences in some of the scores was significant and indicated the existence of certain problems. She testified that Joseph has a learning disability and that he performs at the 1st, 2nd, or 3rd grade levels while he is actually in the 6th grade, although in special education. She stated he is a general borderline range and that his verbal difficulties are more pronounced

than his visual difficulties. She stated her examinations and testings indicate some dysfunction of the left hemisphere.

She stated he will probably need additional services not currently available at his school and that it is hard to say whether he'll ever develop compensatory methods for coping and learning. As a result she stated he may be subjected to depression and embarrassment which will continue to make it difficult for him to learn as he moves ahead in life.

She stated there are no other factors involved in his background besides lead exposure to account for his difficulties and opined that lead exposure and the blood lead levels in his body were significant contributing factors to his damage and his problems.

She examined Thomas Lukasewicz and interviewed him, together with his parents on December 8, 1997. She stated Thomas has the least deficit of the four children she examined on that day.

She testified he has average intellectual function and his arithmetic is low average. She testified she saw some discontinuity in his performance from his inability to do simple tasks ranging to his ability to do harder tasks. She testified he is not learning disabled but not attentive enough for his developmental age and he has some attention deficit problems. She testified he has long-standing problems with attention and concentration and this sometimes results in disruptive behavior. She described his difficulty as mild learning deficits.

She stated there are certain steps needed to improve his attention and general condition. She testified that exposure to lead from his infancy was the main variant in his childhood; that studies show that this can be a cause of problems similar to what he has; and that in her opinion lead exposure to the levels testified in this case was a substantial factor in causing his difficulties.

In general, she testified that Benjamin Doyle is learning disabled, ADHD; that Thomas Lukasewicz has ADD with no learning disabilities; and that Justin and Joseph Miller both have learning disabilities.

On cross examination concerning Thomas Lukasewicz, she acknowledged that the records indicated he continued to do well after the 4th grade and he did not demonstrate acute difficulties. She agreed his records show that he received honors in the 8th grade.

She acknowledged she never visited the homes of any of the children or the community where Plaintiffs were raised. She testified, regarding lead, that it was the various standards produced by governmental agencies, etc., and reported literature, that helped her to understand the results of their exposures.

She testified, at times, genetics can be a factor in some of the difficulties found in the four Plaintiffs involved in this case examined by her. She stated further she did not get the parents' school records or any other information on the particular parents' background at the time she examined the Plaintiffs. She went over at length with defense counsel her familiarity or lack of familiarity with a number of the studies and articles written or done on lead and blood lead levels in children and indicated they showed much of difference of opinion. She was familiar with some of the standards set by the various governmental agencies and conclusions in the various articles. Also on cross examination, she reviewed backgrounds of some of the children and families involved and stated, for instance, that school absence is important to look at in trying to determine the origin of the disabilities in children such as the Plaintiffs, but that it would not help to go to school very often if a person is not able to understand what's being taught since attendance would only cause more aggravation under such circumstances.

The witness adhered firmly to her conclusion that the difficulties she observed in these four children were caused by lead exposure in their lifetimes at their homes and in the community where they lived in Throop, Pennsylvania.

Some testimony of *David Miller* was read into the record from a prior deposition taken of this witness. The reading into the record showed David Miller had a great many days of absence from school, that he lived at 311 Rebecca Street, since 1984; that improvements to the property were done in 1984 and 1985, where all of the siding and much of the other parts of the property were removed and replaced when extensive renovations were completed. He stated that he graduated from the 12th grade and that he was generally a C/D student.

Some of the testimony of *Leroy Doyle,* father of two Plaintiffs, given at a prior time, was read into the record. He stated he lived at 840 Murray Street for 38 years. He stated the home was built in 1922; that he left school in the 9th grade and went into the Navy and he never finished his "GED examination". He stated he was lazy and not interested very much in learning. He testified his daughter Angeleen was about average or a little bit better in his opinion. He testified his son, Benjamin, had some learning problems and was generally inattentive.

V

### DISCUSSION OF DEFENDANT'S TESTIMONY ON MEDICAL CAUSATION

On the issue of medical causation, the Defendant Gould called three witnesses. Gould contends, by virtue of the testimony of these witnesses, they proved that none of the Plaintiffs were exposed to sufficient levels of lead to cause injury or harm.

They further contend they have shown that learning disabilities are not caused by lead but rather, generally result from genetic causes or from some unknown etiology.

They argue further Plaintiffs were not exposed to a home or family atmosphere or guidance that encouraged academic or individual achievement and argue if Plaintiffs' learning disabilities were not caused by absence of home guidance and home environment, the learning disabilities clearly were aggravated by the conditions described by their witnesses.

*Claire B. Ernhart, Ph.D.,* is a research psychologist, who was the principal researcher on a number of studies, including the "Cleveland" study discussed by a number of the witnesses in this case and introduced in this trial (See Defendant's Exhibit # 37).

She is a retired medical school professor and has spent most of her career on study and research involving the early development of children.

She testified extensively about her familiarity and involvement in many of the studies done regarding the effect of lead in young children. She stated she knew there were studies where other researchers found an inverse relationship between blood level and cognitive development, but in her opinion many of those studies were often inconsistent with each other and internally inconsistent and indicated she disagreed with many of their findings. She also discussed the reason for her disagreement with many of the studies and indicated, in her opinion, if there was any effect at all that it had to be extremely small.

She also testified the lead effect conclusions which some authors have reached when studying groups of individuals cannot be applied to an individual patient. She stated group conclusions cannot be applied to individuals because lead does not effect everyone in the same way and each patient must be examined individually to reach conclusions for that certain individual.

She testified she reviewed all available records pertaining to each of the Plaintiffs in this case, as well as their family mem-

bers. She emphasized the importance of information pertaining to the siblings and families, and the home environment of all of the claimants involved in this matter. She emphasized, parental school records are very important because, in her opinion, one of the major factors considered in looking at a child's development, is the record of that particular child's parents. Thus, she strongly emphasized the "genetic factor" issue in reaching her determinations.

Regarding the Doyle and Miller families, she stated her opinion was genetics and family environment were the most likely causes of any learning disabilities. She found no learning or other disability in Thomas Lukasewicz and generally, her opinion was that none of the Plaintiffs had any learning or other disability in any way associated with or caused by blood lead levels.

She announced a strong opinion that lead, even in higher levels than those shown here among the five Plaintiffs, does not contribute to or cause learning disabilities.

She testified genetic background, family background, household status, and conduct of family affairs were much more important and contributed or caused the difficulties of all of the children she examined in this case.

**Walter Molofsky, M.D.,** is a pediatric neurologist. He is presently associated with the Institute for Neurology and Neurosurgery at the Beth Israel Medical Center in New York, N.Y.

He testified he regularly treats children who have learning disabilities and attention deficit hyperactivity disorder, as well as other behavioral problems.

He stated he was familiar with much of the literature on lead exposure and learning disabilities, but insisted there is no literature that relates any individual child's case to lead exposure and stated the studies are only gross studies with generalities as their conclusions, and that none of them

is useful in determining the exact problem with any specific individual child.

He examined all of the children named as Plaintiffs in this dispute on January 11 and January 18, 1998. He testified the matters he studied regarding the children included the background of the parents, and he also had some neurological reports, school reports and medical reports and blood lead information that he used in his examination.

He stated learning disability is a very common problem and between 5 and 10 percent of the children he sees have disabilities. He listed the causes of these learning disabilities as (1) problems the children are born with, mainly brain deficits; and (2) external causes such as medical illnesses or trauma, etc. He stated there is no literature that demonstrates lead causes learning disabilities.

He testified, regarding the five children he examined, there is no scientific basis to conclude that lead had any connection with their problems.

Regarding Thomas Lukasewicz, he found no significant problems at all. He stated he is a normal child who has a mild attention problem and nothing that limits his abilities and his proficiencies.

Regarding Angeleen Doyle, he stated she does not have a learning disability; that she has some disability, but that it would not harm her in any way. He testified that, whatever the blood lead readings were regarding Angeleen, they were very low and that there was no evidence they had any impact on her abilities.

Regarding Benjamin Doyle, he stated he does have some learning disability regarding language skills. He opined, however, this was not caused by lead and if he does have ADHD, inattentive type, there was no association between his blood lead levels and any difficulties he demonstrated.

Regarding Justin Miller he said he observed some central difficulties and some learning and other difficulties, but none

were caused by blood lead levels in his body.

Regarding Joseph Miller he testified that Joseph has some learning cognitive verbal problems, but none of his problems were caused by the blood lead levels in his body.

He stated the learning disabilities of several of these Plaintiffs were defined as "static encephalopathy". In other words, he stated, these people are born with these problems and there is no specific cause that can be determined. He particularly stated there is nothing to indicate that lead in their bodies had anything to do with their problems.

On cross examination he repeated learning disabilities just happen and there is no study in existence which helps anyone to decide that a particular child has learning disabilities as a result of lead ingestion. He also stated no one knows whether there is any connection between blood lead levels, even at very high levels, and learning disabilities.

*Paul Moberg* testified he is with the Department of Psychiatry at the University of Pennsylvania Hospital; he is a Clinical Neuropsychologist; he has a Bachelor's Degree from Augsberg College in Minnesota; a Master's Degree from Loyola in Baltimore, and a Doctoral Degree from the Children's Medical School. He is a licensed, Board Certified, Neuropsychologist in Pennsylvania. He testified he does considerable work examining children like those involved in this case and is familiar with the relationship of toxin in the blood and the conduct of human beings, and with publications on lead, particularly as it affects children.

He stated about 15% of his patients have learning disabilities, and there are many causative factors, such as genetics, idiopathic (unknown) injuries, environment, home conditions, and medical status, etc. He testified he had the reports of other doctors and examiners in this case, and he did not have to repeat these examinations.

He also had the blood lead readings and depositions and parental records.

He stated as to Thomas Lukasewicz, he found no learning disability, but found he had a mild attention problem. He stated he does not find ADHD and many of the scores of Thomas Lukasewicz were within normal limits, showing he has no significant impairments. He testified his school records were good; he only showed a normal variability; and he should have no problems with the normal application of his abilities for the rest of his life.

On Angeleen Doyle, he stated she had a mild left hemisphere dysfunction, similar to what witness Bartolic found, and that it was demonstrated by her low abilities and verbal skills. He disagreed that she had any learning disability and stated with good motivation and good atmosphere she should be fine for the rest of her life. He ascribed the causes of any dysfunction to familial problems and to the fact that school records of her family were very much the same, showing genetic inheritance. He stated the family records showed a poor attitude concerning academic achievement.

As to Benjamin Doyle, he said he has a learning disability in reading, writing and math and other problems; basically a verbally based learning disability. He testified he did not agree with Dr. Koffler, however, that this Plaintiff has an ADHD disorder (including hyperactivity). He stated anyone with a learning disability has some attention problems, but ADHD is not the proper diagnosis in this case, and whatever problem Benjamin Doyle has is encompassed in the general description of learning disability.

He stated, in his opinion, the cause of Benjamin Doyle's problem is the family history and background in which he was raised, including the fact that there was considerable absenteeism allowed or even encouraged by the family.

As to Justin Miller, he agreed he has a learning disability and it is reflected in

difficulty with mathematics, reading and visual perceptual problems. He stated Justin's mother's school records and the general family background shows significant similar problems, and he would ascribe this as the cause or origin of Justin's disabilities, rather than anything else in his background or record.

On Joseph Miller he stated this Plaintiff also has a learning disability and here he agrees somewhat with the opinion of Dr. Koffler, that his learning disability is in the area of reading, comprehension and memory. He stated, however, that long standing family learning disabilities are the most important aspect in trying to determine the cause of Joseph Miller's problems.

Regarding all of these cases, he stated, any disorder can come from a number of contributing causes, but while one should consider lead exposure, he did not see it as the cause of any of disabilities in these five Plaintiffs. He found that familial problems were the cause of most of the problems he saw in the Plaintiffs.

## VI

### DEFENDANT'S TESTIMONY ON ENVIRONMENT, INJURY AND CAUSATION

The Defendant called three environmental scientists as their experts on dispersion of lead in the atmosphere, as well as lead soil levels and lead blood levels.

Barbara Forslund described the Defendant's operation and the Marjol–Throop area in general and the way in which the Defendant attempted to ascertain the amount and the breadth of the dispersion of lead from the site. She also gave her opinion as to background lead levels and the amount of lead contributed to the general area as a result of the operations at the site.

Dr. Mitchell J. Small testified about his method of calculating average background and average lead contributions from the operation of the Marjol site.

Dr. Bobby Wixson testified concerning the relationship between soil lead levels and blood lead levels. He described methods that have been used to develop cliffs to assist in making such relative observations.

*Barbara Forslund* testified that she is a Civil Engineer and Senior Vice President of Advance GEO Corporation. She has a Bachelor of Science Degree and a Master of Science from the University of Michigan and is registered as an engineer in Pennsylvania and several other states. She has been Project Manager for the Defendant for the work being done on the Marjol site and in the adjacent residential community since 1987. In her capacity as Project Manager, Ms. Forslund described the Marjol site and also the battery crushing operation which took place there and how that operation resulted in the dispersion of lead pollution over the entire community.

She testified about her knowledge of the general area in Throop, Pennsylvania, and other communities in Northeastern Pennsylvania and stated there are various deposits of lead in all of the properties in Northeastern Pennsylvania and the amount of lead varies, depending on the nature of the community and the various operations that take place in each community. Like other witnesses, she identified sources such as lead paint, gasoline, trash burning, coal mining and other sources as commonly contributing to the amount of lead in communities like Throop. She acknowledged that an operation such as Marjol would have a significant impact and did, in fact, contribute to the lead level on the various properties in Throop, including the properties of the Plaintiffs in this action.

She testified about working with Dr. Small and trying to develop a method to determine what the actual Marjol contribution was to the lead on the various properties in the Throop area. She acknowledged it was Dr. Small's opinion that 275

ppm represented the average background level in a community like Throop, but stated that her own opinion was that it would be closer to 300 ppm. She stated that her average was arrived at by her work in various communities throughout Northeastern Pennsylvania.

She described the site of the operation as being on a hillside and indicated its position was a significant factor in allowing the winds to carry emissions off the property and scattering them throughout the community. She stated studies indicated the amount of deposits of these emissions lessened the farther away one got or the farther away a property existed from the Marjol site. She also explained how the Defendant arranged a review of this dispersion a plan could be developed to remediate certain lots and cleanup the contamination. She also testified about the contours of the land and the location of items such as tree lines, which in her opinion, would have made it more difficult for the contamination from the Marjol site to reach certain of the properties involved in this lawsuit.

She identified readings for the three properties involved in this incident which were the Doyle property at 240 ppm, the Miller property at 635 ppm and the Lukasewicz property at 298 ppm. She acknowledged that there was a great variability in the readings, depending on where they were taken on specific properties and depending on where they were taken throughout the community. She testified, in her opinion, such variability is common in urban areas and shows more about what individuals did with and on their properties, rather than any other exterior contribution of lead, such as a contribution from the Marjol operation.

***Michael J. Small, Ph.D.,*** testified he has a Bachelor's Degree in Civil and Environmental Engineering from Carnegie Mellon Institute in Pittsburgh, Pennsylvania; and a Master's and Doctoral Degree in Environmental and Water Resource Engineering from the University of Michigan.

He is presently a Professor of Environmental Engineering and Public Policy at Carnegie Mellon University in Pittsburgh, Pennsylvania.

He testified he advised various groups, including governmental groups on such things as mathematical modeling used to predict how various particles move through the air. He described his work in developing mathematical models so persons can predict as accurately as possible "how does anything released into the environment move about and where does it land".

He testified he was hired by the Defendant Company to determine the dispersion of the releases from the Marjol site into the Throop community.

He developed a model that was used to calculate not only the entire distribution in the community but an average reading on the various lots and in the various spots throughout the community. He pointed out this model was used to develop maps and means by which the Defendant designed a plan to remediate various properties within certain areas which showed contributions of 500 ppm or in excess, as one moved outward from the Marjol site. He used an intricate mathematical formula to develop the model.

Although his work did not begin until 1991, long after the pollution occurred and the dispersion of the lead particles occurred, he testified he was able to make certain calculations and develop formulas which allowed him to make what he considered to be very accurate determinations of the amount and breadth of the dispersion of the particles from the site. He testified he was able, by use of the modeling, to determine what, in his opinion, was the average background level of lead, particularly on the lots in question in this lawsuit. He stated he was able to make a specific determination as to the amount of lead contributed by the emissions from the Marjol site to each of the properties involved.

His opinion was that the average background lead level on lots in the Throop community, particularly those such as involved in this lawsuit was 275 ppm and in regard to the specific lots involved, he testified that the average contribution to the Lukasewicz (816 George Street) was 88 ppm; that the contribution to the Doyle property (840 Murray Street) was 37 ppm; and the average contribution to the Miller property (311 Rebecca Street) was 11 ppm.

By reference to contour lines on a map introduced in evidence, he explained how it was determined that on lots close to the Marjol site, there was a finding of a lead contribution of 2000 ppm, while on lots extended out much farther from the site, there were readings of 50 to 100 ppm. He used the model he developed and to compute average contributions to each of the three properties involved in this trial.

***Bobby G. Wixson, Ph.D.*** testified he is both Dean Emeritus and Professor Emeritus at the University of Missouri and has a Bachelor and Master of Science in Geology from the University of Texas and a Doctorate on Aquatic Biology and Oceanology from Texas A & M. He described a lengthy and wide experience with a large number of organizations and programs throughout the world where he was involved in the broad general issues of lead in the environment and the effects of lead on human beings. He indicated there has been shown some relationship between soil lead and blood lead levels, in children especially. He went on to point out, however, that in his opinion there must be a very large increase in the soil lead levels where children are raised to make any significant increase in the blood lead levels of those children. He stated there has been developed a slope type of formula or figure that is used to measure what contribution the lead in soil makes to the elevation in blood levels.

He stated with an increase of 1,000 ppm lead in soil it was reasonable to assume there would be an average between 2 to 5 UG–DL increase in the blood lead levels of children raised on that property. Using the slope of 5 UG/DL per 1,000 ppm increase in soil lead levels, he calculated the effect such Marjol contributions would have had on the children living on the properties involved in this litigation. Using the slope relationship, this witness also gave opinions as to what the increase in blood lead for a child at each property involved in this litigation would be assuming all of the lead on that property came from the Marjol site and listed the projected increases as follows:

Lukasewicz property
(816 George Street)    2.875    UG/DL
Doyle property
(840 Murray Street)    1.2    UG/DL
Miller property
(311 Rebecca Street)    3.175    UG/DL

The witness then stated his opinion that the total soil lead at each of the three properties involved herein did not constitute a health hazard for the individual Plaintiffs, even if one were to assume that all of the lead came from the Marjol site and there was no other background contribution at all.

He stated, in his opinion, the lead in soil at the properties involved herein did not explain the reported blood lead levels of the Plaintiffs involved in this action. It was his opinion that the levels of lead found in the soil on the properties of the Plaintiffs involved in this action would only amount to very small elevations of blood levels in their bodies and they would not constitute a health hazard.

On cross examination this witness indicated that what is considered a high blood level has changed over a period of time and that the "government" now uses approximately 10 ppm in children as a level of clinical concern.

## VII

### *WITNESSES—WEIGHT AND CREDIBILITY*

We give more weight and credibility to the Plaintiffs' witnesses, and this leads to

the conclusion that the Plaintiffs have sustained their burden of proof.

On the issue of lead contamination, and lead hazards, the Defendant presented Witnesses Forslund, Small and Wixson. All have impeccable credentials. But Forslund is a long-time employee of the Defendant, and her testimony must be examined in that light. Her casual attitude appeared to cause her to diminish the impact of what everyone agrees was an extraordinary event in the history of this community. Overall, she would diminish the contamination even below the other expert for the Defendant—and at the same time, exaggerate effects of other lead sources with little or no valid reason or justification.

Dr. Small, while not an employee, as such, was hired by the Defendant to determine the spread of contamination and to establish defense lines for rehabilitation of some properties. His introduction to the area was many years after the contamination took place.

While done with what is called mathematical precision, his development of models was based on certain assumptions needed to finish and complete the appropriate equations. Adjustment of these assumptions, as he agreed, would, of course, result in different answers and different levels of contamination. It is not the same certainty that comes with working immediately upon the occasion of an event to establish causation.

Dr. Wixson used formulas developed—again—as generalities and found little foundation in conditions actually existing through the years of the Defendant's operation and daily spreading of the contamination. He also acknowledged a relationship between blood lead levels and conditions similar to those suffered by the minor Plaintiffs. His argument is basically one of degree and I choose to give more weight to the Plaintiffs' witnesses' testimony in this regard.

The Plaintiffs' own testimony was more fact-based—to the extent that many witnesses saw and felt and lived through the contamination, and its daily effects.

Plaintiffs' witness on lead levels (Shoener) was the on-site observer of the Defendant's activities and the effects of the contamination on the community. He also had lengthy first-hand experience with all aspects of lead, its dispersion and contamination effects.

The medical witnesses for the Defendant appeared, to this Court, to have a jaundiced eye regarding blood lead level effects on human beings, and particularly, on children. Some of their testimony was diminished by their overall opinion that lead, except in extremely high levels, has little or no effect on children, and the further conclusory opinion that learning disabilities are generally ascribable to familial backgrounds or result from no known causation.

On the other hand, the Plaintiffs' medical experts devoted their attempts to establish causation in the individual Plaintiffs. On this level, they agreed with Defendant's experts that use of general broad studies would not be conclusory as to individual cases, but in their minds the studies were valuable in establishing a basic premise that lead at certain levels can be damaging to human beings. On the basis of their extensive examinations of the Plaintiffs they base their decisions on the effects of the blood lead levels in the individual cases and this was much more impressive to the Court.

Throughout this case there has been much discussion and testimony by witnesses about the concept of the "background" condition of the individual properties. Background has been defined by both sides as the amount of lead which would be present without any contribution from the named Defendant herein.

Much time was spent—and much of the Defendant's experts testimony was devoted—to an effort to distinguish the back-

ground level of lead at each property from the amount that would have been contributed by the Defendant. The Defendant's effort—of course—was aimed at attempting to show that the Defendant's contribution of lead was not sufficient enough to cause Plaintiffs' injuries—and that there was lead from other sources (i.e.paint) that could have been the source of any injury to the Plaintiffs.

This reasoning is strange for at least two reasons:

(1) It concentrates on the lead found on the specific properties where the individual homes were located, and it ignores lead contamination from any other source, i.e. ambient air flows and other places in the community where Plaintiffs walked, played and visited.

(2) It somewhat contradicts the Defendant's expert's testimony that you cannot use general studies to draw conclusions in individual cases.

The outstanding factual reality in these cases is that Marjol constituted an exquisite widespread source of lead contamination in this community for a long period of time.

In truth, there has been a significant effort by Gould—(not Marjol) to measure that contribution, and do something about it. But the measurements are made long after the fact—and while done with the best intentions and technology—the announced results are in large measure based on hindsight and scientific or mathematical speculation. (See testimony of witnesses Forslund, Wixson, and Small).

The Plaintiffs, and their witnesses, on the other hand, rely on certain ascertainable or certain present facts, i.e. the blood lead levels of the Plaintiffs—as well as many general studies that have been done on the effects of lead, particularly lead in the blood of very young people. Further, they rely on the testimony of experts, who after examination of each of the Plaintiffs, and after a thorough review of their family backgrounds, etc. as well as a review of the many studies in this area, find nothing else that would cause the Plaintiffs' injuries, except the ingested lead and they opine that the blood lead is the cause of their injuries.

## VIII

### DISCUSSION AND FINDINGS

When we put the calculations and opinions and latter day thinking aside, we find certain present proven and admitted facts:

(1) The Plaintiffs do have or did have significant blood lead levels.

| Plaintiff | Blood Lead | Age at measurement | |
| --- | --- | --- | --- |
| Thomas A. Lukasewicz | 9 | 3 yrs. | 1 mo. |
| Angeleen Doyle | 21 | 7 yrs. | 6 mos. |
| Benjamin Doyle | 14 | 4 yrs. | 4 mos. |
| Joseph Miller | 25 | 2 yrs. | 1 mo. |
| Justin Miller | 14 | 5 yrs. | 3 mos. |

(See Joint Exhibit # 1)

---

Center for Disease Control (CDC) considers blood lead level of 10 in children as a signal for concern.

(2) Certain levels of lead in the human body can be dangerous and cause injuries.

(3) At least four of the five Plaintiffs have demonstrable injuries (mainly learning disabilities).

(4) Plaintiffs' experts state the cause of these injuries is the lead in the bodies or bloodstreams of the individual Plaintiffs.

(5) The Plaintiffs have all lived their entire lives in the community surrounding the Marjol plant.

(6) Lead emissions from Marjol for many years contaminated the community in which the Plaintiffs have lived, ie;

*Defendant's Admitted Average Contribution to Each Property*

| | |
|---|---|
| Lukasewicz | 188 ppm |
| Miller | 11 ppm |
| Doyle | 37 ppm |

(7) There were many other readings for the properties, such as:

| | |
|---|---|
| Lukasewicz | 575 ppm |
| Miller | 635 ppm |
| Doyle | 240 ppm |

(8) All of the Plaintiffs were exposed in various degrees to this contamination.

It may be difficult (and as the testimony shows, it is subject to different expert opinions) at this point in time, to determine exact proportions of contamination—but Marjol—over a long period of time—contributed significantly to the general lead contamination of this community. There is no credible evidence to show the injuries would have occurred without the lead contamination resulting from the Defendant's negligence.

## IX

### INJURY—CAUSATION

The Defendant's presented expert opinion and testimony on the role that genetics and family environment can play in causing or resulting in learning disabilities. There is a distinct lack of credible testimony in these particular cases, however, showing that genetics or family environments did, in fact, cause the difficulties suffered by these individual Plaintiffs. While perhaps the families involved were not sterling examples of academic achievement and intellectual encouragement, there is no showing of abject neglect or continual lack of interest in their children's welfare and achievements that would cause such severe problems, absent the intrusion of lead contamination suffered by the Plaintiffs in this case.

■ The Court finds, therefore, the four named Plaintiffs, Angeleen Doyle, Benjamin Doyle, Justin Miller, and Joseph Miller, have sustained their burden of proving by the fair weight and preponderance of the evidence, that they suffer from injuries caused by excessive levels of lead in their bodies. We find, further, the excessive lead levels were caused by the Defendant's negligent acts which, in turn, cause lead in excessive amounts to contaminate the properties and community where the Plaintiffs lived.

The Court finds the injuries have and will continue to affect their lives and, particularly, learning capacities of the four named Plaintiffs. They are, therefore, entitled to damages to compensate them for their negligently caused injuries and damage.

On the other hand, Thomas Lukasewicz's general demeanor and his ability to comprehend and respond to all questions asked of him, together with his record, and the testimony of experts who examined him, establishes a young man who demonstrates very little, if anything, of any mental or learning disabilities. Indeed, his appearance and his background depict someone of a very normal capacity who perhaps, like most children his age, requires continued parental and adult attention, urging an example to spur him to do his best to achieve his full potential. The record, therefore, fails to establish that he has any compensable injury.[6]

## X

### DAMAGES

While we point to specific testimony and evidence to support the conclusion of negli-

---

**6.** Plaintiff Lukasewicz would have no claim even under the Pennsylvania Hazardous Sites Cleanup Act (35 P.S. § 6020.1109) since he has proved no injury. (See Footnote # 4)

gence, causation and injuries, the evidence and testimony on damages is quite sparse. We cannot, however, rely on conjecture—nor can we be guided by emotion. We are, of course, bound by the agreement of the parties, that no single award may exceed $100,000.00. Otherwise, we have struggled to find in the testimony and evidence, reliable data which helps to establish proper damage amounts.

There is not much specific evidence or testimony about the cost of help the Plaintiffs may need or seek in the future—nor what diminishment they might suffer as to future earnings or life pleasures.

■ We do have testimony that Angeleen Doyle may accomplish certain levels of education and employment, but the testimony clearly shows it will take special help for her and special guidance, and even then, her horizons will be considerably limited and any success she might have will require special effort and guidance to overcome the difficulties.

■ The evidence leads us to conclude that Benjamin Doyle may be more limited in his future. His educational possibility is much more limited—and possible employment likely will be very restricted. There will be a continuing need for more extensive help and guidance well beyond that received in the normal school curriculum.

■ Justin Miller has considerable dysfunction, which will cause continued learning difficulties, and he will need extensive services to cope with normal learning, as well as earning abilities. He, too, will require much more than normal or average educational direction and guidance in order to establish any type of reasonable living and earning capacity.

■ Joseph Miller is borderline mentally disabled with considerable verbal difficulties, and will need continued special help and services to cope with these problems. Even with such help, services, and guidance, it will be most difficult for Joseph Miller to accomplish basic education and to acquire and be able to retain simple work.

On a scale the Court perceives as responsible under all aspects of this case and the testimony we heard—and including an effort to see that the damages are proportionate to each of the Plaintiff's injuries, we will award

To Angeleen Doyle the sum of $25,000

To Benjamin Doyle the sum of $30,000

To Justin Miller the sum of $35,000

To Joseph Miller the sum of $40,000.

## XI

### *VERDICT*

As a result of the foregoing, the Clerk is directed to enter the following Verdict:

NOW, THIS 3rd DAY OF FEBRUARY, 2000, a Verdict is hereby entered against the Defendant, Gould Electronics, Inc., and in favor of each Plaintiff in the amounts as follows:

To Leroy and Shirley Doyle, as the parents and natural guardians of Angeleen Doyle, the sum of $25,000

To Leroy and Shirley Doyle, as the parents and natural guardians of Benjamin Doyle, the sum of $30,000

To David and Linda Marie Miller, as the parents and natural guardians of Justin Miller, the sum of $35,000

To David and Linda Marie Miller, as the parents and natural guardians of Joseph Miller, the sum of $40,000.